1
2
3
4
5

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DONNA VANCE, | ) | Case No.: 1:11-cv-01312-LJO-SKO |
| | ) | |
| Plaintiff, | ) | **FINDINGS AND RECOMMENDATIONS** |
| | ) | **REGARDING PLAINTIFF'S SOCIAL** |
| v. | ) | **SECURITY COMPLAINT** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | (Doc. 1) |
| | ) | |
| Defendant. | ) | **OBJECTIONS DUE:  14 DAYS** |
| | ) | |
| _____ | ) | |

## I.  BACKGROUND

Plaintiff Donna Vance ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1959, has a high school diploma, and previously worked as a home health attendant.  (Administrative Record ("AR") 497, 1121, 1146.)  On April 18, 2005, Plaintiff filed an application for SSI, alleging disability beginning on September 6, 2003, due to osteoarthrosis and allied disorders and affective mood disorders.  (AR 395-96, 417-21, 490.)  Plaintiff has filed five prior applications for SSI.  (*See* AR 18, 54, 397-98, 406-16, 422-32.)

**A.      Relevant Medical Evidence**

Plaintiff was seen May 19, 2004, by John Payne, M.D., of Stanislaus County Health Services Agency. (AR 1023.)  Plaintiff indicated that her knees hurt when walking. (AR 1023.)

On July 15, 2004, Plaintiff was seen at the emergency room of Doctors Medical Center for pain in the extremities. (AR 6459)  She was diagnosed with degenerative joint disease of the knees with increasing pain and was prescribed Vicodin. (AR 660.)

On July 15, 2004, Plaintiff was seen at Golden Valley Health Centers ("Golden Valley") by Nurse Practitioner Linda Tripp for knee pain and medications.  Plaintiff indicated that she had been without medication for ten days. (AR 1071.)   Plaintiff reported that the pain in her knee had increased. (AR 1071.) The medical notes indicate that Plaintiff's knee needed surgery, but there were complications due to age and morbid obesity. (AR 1071.)  Plaintiff was diagnosed with bilateral knee deterioration, severe hypertension, and depression. (AR 1071.)

On August 16, 2004, Plaintiff was seen at Golden Valley by Nurse Tripp for knee pain, carpal tunnel syndrome, and to refill her medications. (AR 675.)  Plaintiff complained that her leg hurt and felt like it would "collapse." (AR 675.)  Plaintiff was assessed with morbid obesity, knee pain in need of surgery, and carpal tunnel pain; it was noted that her hypertension had "improved." (AR 675.)

On September 8, 2004, Plaintiff was seen at the emergency room of Doctors Medical Center for pain and swelling in the left leg. (AR 648.)  She was assessed with left leg cellulitis and was treated with antibiotics. (AR 648-49.)

On September 20, 2004, Plaintiff was seen at Golden Valley by Nurse Tripp for a medication refill and to follow up on her cellulitis. (AR 673.)  Her left lower leg had been infected, but it was "better" although there was still "some tenderness." (AR 673.)

On October 19, 2004, Plaintiff was seen by Necholas Aboughannam, M.D., for a comprehensive internal medicine evaluation. (AR 606-10.) Dr. Aboughannam reviewed Plaintiff's records and noted that bilateral knee x-rays had been performed in November 2003 that showed "severe narrowing of the medial joint space involving the left knee." (AR 606.)  There were also x-rays performed on the pelvis and hips that "demonstrated mild sclerosis involving the right

sacroiliac joints" and bilateral ankle x-rays that showed "no gross abnormalities." (AR 606.)  Dr. Aboughannam reported that Plaintiff's present illnesses were carpal tunnel syndrome and bilateral knee pain. (AR 606-07.)  Plaintiff complained of "numbness in her fingers and burning pain in her right wrist and hands that interferes with her manual activities" and "pain and swelling in both knees in the left more than the right." (AR 606-07.)  Plaintiff reported difficulties cause by carpal tunnel that interfered with "manual activities such as buttoning, writing, cooking, holding, and even holding food to eat," and an inability to stand or walk for long periods because of bilateral knee pain. (AR 607.)

Dr. Aboughannam examined Plaintiff and noted the following general findings:

1.   Phalen's sign.  The claimant was not able to hold her wrists flexed for one minute because of pain in the right forearm.
2.   Tinel's sign did not cause numbness in the right hand.
3.   Bilateral knee tenderness and mild effusion.
4.   Bilateral lower extremity pedal edema +2.

(AR 609.)  Plaintiff was diagnosed with right carpal tunnel syndrome, severe by history; left knee severe osteoarthritis; morbid obesity; hypertension; gastroesophageal reflux disease; and depression. (AR 609-10.)  Regarding the carpal tunnel diagnosis, Dr. Aboughannam noted that "[t]here is no decrease in grip strength on today's physical examination but it would be helpful for [Plaintiff] to have diagnostic studies to assess her disability of her right carpal tunnel which is interfering with her activities of daily living as she described . . ." (AR 609.)

On October 20, 2004, Plaintiff was seen for a medication refill visit at Golden Valley by Nurse Tripp. (AR 672.)  Plaintiff reported that her knees and legs felt stiff and painful upon standing. (AR 672.)

On October 25, 2004, Plaintiff underwent a comprehensive psychiatric evaluation by Sudha Manjunath, M.D. (AR 611-15.)  Dr. Manjunath noted that Plaintiff reported that "as long as she is taking her medication, which is Zoloft 100mg[,] she is fine." (AR 611.)  She was being prescribed Zoloft by a nurse practitioner. (AR 612.) Plaintiff stated that she was in a "different psychologic condition than she was three years ago" before taking Zoloft, when she was "very depressed, very sad, [and] think[ing] of dying all the time." (AR 611.) However, Plaintiff reported that "[e]ver since taking Zoloft, . . . she is less distressed, more motivated, and has good energy.  She looks at the

3

bright side of life." (AR 611.) Plaintiff stated that her relationship with her current husband, who she had met three years prior, "plays a role in her feeling better psychologically." (AR 611.) Plaintiff also reported having been in an abusive prior marriage. (AR 611.) Plaintiff further reported that "she has four children, but two of her children were taken away by Children Services because she could not handle them." (AR 612.) Plaintiff reported that she had "depression for several years," and had tried several medications.

Dr. Manjunath noted that Plaintiff reported that Plaintiff had not worked "in a long time" due to complaints of carpal tunnel and knee pain, and that she had provided in-home care at her prior job, which "lasted for three months" before "she had to quit because she did not like the job." (AR 613.) Dr. Manjunath found Plaintiff to be "pretty functional" in her activities of daily living, and she would socialize with a few friends and mostly spend time with her husband. She would, "at times," see her children who were in foster care, and reported that her children "can call her anytime." (AR 613.) Plaintiff reported that she drinks "very, very occasionally," and that she "experimented with marijuana, but does not do this anymore." (AR 613.)

Dr. Manjunath performed a mental status examination. (AR 614.) Plaintiff was diagnosed with dysthymic disorder and dependent personality disorder. (AR 614.) Plaintiff was assessed with a Global Assessment of Functioning score ("GAF") of 65.[1] Dr. Manjunath opined that Plaintiff's "problem is treatable. Right now, her symptoms are under control. . . . As long as she is compliant with her medications, her problems seem pretty good." (AR 615.) Dr. Manjunath provided a functional assessment and stated that Plaintiff was "able to perform simple and repetitive tasks" and could "probably handle more complex tasks." (AR 615.) Plaintiff "should not have any difficulties accepting instructions from supervisors and interacting with coworkers," and "should be able to maintain regular attendance." (AR 615.)

---

[1] The GAF scale, also referred to as the Axis V diagnosis, is the consideration of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. Text rev. 2000) [hereinafter "DSM-IV"]. A score between sixty-one and seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well" with some meaningful interpersonal relationships. *Id.* at 34.

4

On November 16, 2004, both mental and physical capacity assessments were completed. (AR 616-26.)  Plaintiff's mental assessment showed that she was "not significantly limited" in any area.  (AR 616-18.)  Plaintiff's physical assessment indicated that she could lift 20 pounds occasionally and 10 pounds frequently; could sit, stand and/or walk six hours in an eight-hour day; was limited in her upper extremities in her ability to push and/or pull; and was occasionally limited to climbing ramps and stairs, as well as stooping, kneeling, crouching, and crawling.  (AR 620-21.)  Plaintiff was also limited in her ability to perform fingering (fine manipulation).  (AR 622.)

On November 19, 2004, Plaintiff was seen for a follow up visit for her hypertension at Golden Valley.  (AR 671.)  Plaintiff reported pain in both knees.  (AR 671.)

On December 3, 2004, a psychiatric review was completed by Charlotte Bible, M.D., which indicated that Plaintiff suffered from affective and personality disorders, but she had no limitations in activities of daily living, maintaining social functioning, or in maintaining concentration, persistence, or pace.  (AR 627-30.)  There was insufficient evidence to show that Plaintiff had any episodes of decompensation of an extended duration.  (AR 630.)

On December 9, 2004, Plaintiff was seen at the emergency room of Doctors Medical Center for bilateral lower-leg swelling, with the left-leg swelling being greater than the right.  (AR 632.)  She was assessed with left lower cellulitis and was treated with antibiotics.  (AR 633.)

On December 10, 2004, Plaintiff was seen at Golden Valley for a follow-up visit to her emergency room visit the previous day.  (AR 670.)

On December 17, 2004, Plaintiff had a medication refill visit at Golden Valley by Nurse Tripp.  (AR 668.)  The edema had decreased in her legs, and her knee pain was being treated with Celebrex.  (AR 668.)  Her laboratory work showed improvement.  (AR 668.)  Plaintiff was also diagnosed with major depressive disorder and post-traumatic stress disorder ("PTSD").  (AR 669.)  Plaintiff reported being depressed and feeling grief and guilt over losing her children to foster care.  (AR 669.)  While Plaintiff admitted to suicidal ideations, she also reported "feeling better" and denied any current suicidal or homicidal thoughts.  (AR 669.)  The treatment notes indicate that the clinician offered Plaintiff "support and encouragement."  (AR 669.)

On January 25, 2005, Plaintiff was seen at Golden Valley by Nurse Tripp for pain in both knees. (AR 667.)  On April 5, 2005, Plaintiff was seen at Golden Valley by Locum Coh Locum, M.D., for wheezing and to obtain medications. (AR 1062.)

On July 11, 2005, Larry R. Sutter, M.D., performed a comprehensive psychiatric evaluation of Plaintiff. (AR 755-60.) Plaintiff was asked why she was applying for Social Security benefits and responded that she applied due to her "mental health . . . [her] carpal tunnel syndrome . . . [her] knees . . . and [her] hips," indicating that she has a "hard time getting up and moving around" if she sits too long and that her "knees start to buckle" when she stands. (AR 755.)  Plaintiff indicated that her "mental health is pretty good – there's no distress" and that there were days she was "mostly up," although she had "down days too." (AR 755.)  Plaintiff indicated that she has a history of past abuse as a child. (AR 756.)  She stated that she "last drank alcohol two weeks ago when she had some malt liquor." (AR 756.)  Plaintiff denied any history of DUIs, blackouts or tremors and denied any use of illicit drugs. (AR 756.)  Plaintiff indicated that she did "[c]ooking, cleaning and laundry," at her home. (AR 756.)  Dr. Sutter performed a mental health examination and diagnosed Plaintiff with depressive disorder, not otherwise specified, mild. (AR 758-59.) Dr. Sutter opined that "[f]rom the psychiatric point of view this claimant would have no impairment or mild impairment interacting with coworkers, supervisors and the public in a work or work-like situation. The claimant had good-normal facial expression. The anti-depressant medication Zoloft has helped a lot. The theme of the interview was physical problems – especially knee pain, back pain and carpal tunnel syndrome." (AR 760.) Dr. Sutter further stated that, from a psychiatric point of view, Plaintiff would have "no impairment" or only "mild impairment" in the workplace performing detailed and complex tasks and maintaining regular attendance. (AR 760.)

On July 22, 2005, Plaintiff was examined by Tri Minh Pham, M.D., who noted that Plaintiff had not taken her medication for over a month "due to no money to buy medications." (AR 761.) Dr. Pham reported that Plaintiff had "no tenderness" in her back and that the range of motion was normal except for bending down about two inches before touching her toes. (AR 762.)  There was no edema, clubbing, or cyanosis in Plaintiff's extremities. (AR 762.)  Dr. Pham examined Plaintiff and tested her range of motion. (AR 762.)  Dr. Pham's impression was that Plaintiff presented with

hypertension controlled by medication, knee pain with history of old operation for the knee and normal range of motion for both knees, excessive obesity, and history of depression treated with medication. (AR 762.)

Plaintiff was seen at Golden Valley by Dr. Locum on August 19, 2005, for carpal tunnel in the right hand, possible menopause, and to obtain medications. (AR 1061.) Plaintiff reported that her right hand was "tingly." (AR 1061.) There were positive "tingle on tapping [right] medial nerve." (AR 1061.) Plaintiff was diagnosed with hypertension, carpal tunnel, obesity, and cellulitis, and was prescribed medication. (AR 1061.)

On August 29, 2005, David Pong, M.D., reviewed Plaintiff's records and assessed her physical residual functional capacity ("RFC").[2]  Dr. Pong opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; could stand, walk and/or sit six hours in an eight-hour day; was unlimited in her ability to push and/or pull; had occasional limitations on her ability to climb, balance, stoop, kneel, crouch, and crawl; and had no other limitations. (AR 765-70.)

On September 9, 2005, Plaintiff was seen for a follow-up visit for hypertension at Golden Valley by Vikram Khanna, M.D. (AR 1060.)

On September 14, 2005, Mario Morando, M.D., performed a review of Plaintiff's psychiatric records and opined that she had a mild depressive impairment with mild limitations regarding restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace with insufficient evidence to determine any episodes of decompensation of an extended duration. (AR 772-74.)

Plaintiff was seen in October, November, and December 2005, by Dr. Khanna at Golden Valley for follow-up visits. (AR 1055-59.) Plaintiff indicated that medication made her feel "drowsy" but "better," although she was "stressed" because she had to move suddenly. (AR 1059.) By November 22, 2005, Plaintiff had become homeless. (AR 1057.) The notes indicate that

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.*

Plaintiff had abnormal Tinels. (AR 1057.) In December 2005, Plaintiff reported that methadone was making her "very tired." (AR 1056.)

In January 2006, Plaintiff reported to Dr. Khanna that she had ongoing pain in both knees and that she no longer had insurance. (AR 1054.)

On February 19, 2006, Steve McIntire, M.D., performed a comprehensive medical evaluation on Plaintiff. (AR 776-79.) Plaintiff described "persistent pain of both knees" and indicated that the "pains occur diffusely involving all aspects of both knees." (AR 776.) Plaintiff reported "swelling and giveaway at times" and that her "knee pain increases with walking or bending activities." (AR 776.) Dr. McIntire performed a neurological/orthopedic examination. (AR 777-78.) For his general findings as to Plaintiff's knees, Dr. McIntire noted bony deformity or effusions, but found "diminished flexion bilaterally," with "medial and lateral joint line tenderness" and "crepitus" bilaterally. (AR 778.) Plaintiff was diagnosed with probable mild osteoarthritis of both knees. (AR 778.) Plaintiff had diminished flexion of both knees without ligamentous instability and that she walked with a mildly antalgic gait. (AR 778.) Dr. McIntire opined that Plaintiff would be limited to six hours of walking or standing in an eight-hour day with no more than two to three hours of continuous walking or standing, she should not engage in activities requiring frequent squatting, crawling, kneeling and climbing, and she should not lift or carry more than 15 pounds frequently and 30 pounds occasionally. (AR 778-79.) Plaintiff had no limitations as to sitting and no manipulative limitations. (AR 779.)

On February 23, 2006, Dr. Bible performed another psychiatric review and opined that Plaintiff was capable of simple unskilled tasks with no other limitations. (AR 780-85.)

On March 9, 2006, Sandra Clancey, M.D., conducted a physical RFC assessment. (AR 786-93.) Reviewing additional medical evidence, Dr. Clancey opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; could stand or walk at least two hours in an eight-hour day; could sit six hours in an eight-hour day; was unlimited in her ability to push and/or pull; had occasional limitations on her ability to climb, balance, and stoop; should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and had no other limitations. (AR 786-93.)

1   Plaintiff was seen several times from March 2006 to August 2006 at the emergency

2   department of Doctors Medical Center for leg pain.  (AR 849-78.)

3   On April 25 and 26, 2006, Plaintiff was seen by Dr. Khanna at Golden Valley for a follow-up

4   visit.  (AR 1051-52.)  Plaintiff continued to have knee pain.  (AR 1051.)  Plaintiff was out of many

5   of her medications.  (AR 1052.)  Dr. Khanna noted that Plaintiff could not afford the copayments

6   on her medication.  (AR 1051.)

7   `Plaintiff was seen at Golden Valley by Dr. Locum on July 7, 2006, for a check-up.  (AR

8   1049.)  The notes indicate that Plaintiff had "multiple problems," and she was diagnosed with cough

9   and upper respiratory infection; stable hypertension; osteoarthritis of her knees; and high cholesterol.

10  (AR 1049.)  Plaintiff was "doing well" with her depression and there was "no need for meds."  (AR

11  1049.)

12  On August 1, 2006, Plaintiff was seen by Dr. Khanna at Golden Valley to refill her

13  medication.  (AR 1048.)  She reported that she was living at a Christian women's home and that

14  "clean [and] sober is the rule of the house."  (AR 1048.)  Plaintiff tested positive for Phalen and

15  Tinel signs.  (AR 1048.)

16  On August 2, 2006, Dr. Khanna completed a questionnaire concerning Plaintiff's treatment.

17  (AR 845-46.)  Dr. Khanna opined that Plaintiff was capable of working but could perform no more

18  than sedentary work and that Plaintiff could sit eight hours and stand/walk two hours in an eight-hour

19  day.  (AR 845.)  Plaintiff's primary impairments were identified as severe knee osteoarthritis, carpal

20  tunnel syndrome, depression, and obesity.  (AR 845.).  Dr. Khanna noted that his opinions were

21  based on the objective findings of positive Tinel's and Phalen's sign and that "EMGs

22  [electromyography][3] have not been possible due to lack of insurance."  (AR 845.)  Dr. Khanna stated

23  that Plaintiff "cannot use her hand more than 1 hour[] per day" and "cannot cope with added stress

24  of phone calls [and] multiple demands."  (AR 845.)  Dr. Khanna diagnosed Plaintiff with carpal

25  tunnel syndrome in both hands and stated that she can carry less than eight ounces frequently.  (AR

26

27

28  [3] Electromyography is defined as a "technique for recording extracellular activity . . . of skeletal muscles . . ."
    *Dorland's Illustrated Medical Dictionary* 609 (31st ed. 2007).

846.)  Dr. Khanna did not indicate on what date he believed Plaintiff had become disabled to the degree indicated.  (AR 846.)

Plaintiff was seen from August through October 2006 at Golden Valley by Dr. Khanna and Daniel Diep, M.D., for follow-up visits.  (AR 1042-47, 1053.)

On December 5, 2006, Plaintiff was seen by Karin Forno, M.D., of Stanislaus County Health Services Agency.  (AR 1022.)  Plaintiff had a cold and indicated that she wanted a sleep study.  (AR 1022.)  Plaintiff stated that she wanted pain medication and requested "narcotic pain meds [and] sleeping pills."  (AR 1022.)  Plaintiff had a tender lumbar and reduced range of motion in both knees.  (AR 1022.)  Plaintiff was diagnosed with sinusitis, hypertension, allergies, asthma, knee problems, back pain, and gastroesophageal reflux disease ("GERD").  (AR 1022.)  Plaintiff was seen by Dr. Forno in March, April, and June 2007 for follow-up visits due to hypertension.  (AR 1020.)

On June 18, 2007, Plaintiff was seen at the emergency department of Doctors Medical Center for a headache that had lasted two days.  (AR 920-26.)  Plaintiff was diagnosed with a tension headache and prescribed Percocet and Valium.  (AR 922.)

Plaintiff was seen in January and February 2008 at Golden Valley for follow-up visits by Dr. Diep.  (AR 1040-41.)  Plaintiff complained of pain in her knees and a lump on her back, and received medication.  (AR 1040-41.)

On March 5, 2008, Jay Dhimar, M.D., conducted a comprehensive internal medical evaluation and noted that Plaintiff's chief complaint was bilateral knee pain. (AR 879-83.) Plaintiff reported that she had pain in both knees, with right greater than left, and it was recommended that she undergo knee replacement surgery. (AR 879.)  Her pain level was eight out of scale of ten, and her knees would "sometimes give out." (AR 879.)  Celebrex "helps her pain moderately." (AR 879.)  Dr. Dhimar noted that Plaintiff was morbidly obese with a slow gait, and she was able to sit through the interview, take off her shoes, and get on and off the examination table without difficulty. (AR 880.)  Plaintiff was able to squat but had knee pain, and was able to heel-toe walk. (AR 881.) The general findings indicated that Plaintiff "has tenderness in the LS spine at myelin.  She has crepitation under both knee caps with laxity of the patellar toward the lateral aspect.  There is no joint effusion." (AR 882.)  Plaintiff was diagnosed with lower back pain, bilateral knee pain,

obesity, asthma, and hypertension. (AR 882.) Dr. Dhimar opined that Plaintiff could stand and walk for about four hours in an eight-hour day with frequent breaks; had no limitations for sitting; could lift 10 pounds frequently and 20 pounds occasionally; could perform bending, stooping, and crouching occasionally; could perform reaching, handling, feeling, fingering, and grasping frequently; and did not have any visual, communicative, or work place environmental limitations. (AR 883; *see also* Dr. Dhimar's Medical Source Statement of Ability to Do Work-Related Activities (Physical), AR 884-90.)

On March 13, 2008, Plaintiff was seen by Philip M. Cushman, Ph.D., for a psychological evaluation. (AR 891-97.) Dr. Cushman performed a mental status exam. (AR 895-96.) His diagnostic impression consisted of breathing-related sleep disorder; physical abuse and neglect of child, by history (victim); physical abuse of adult, by history (victim); major depressive disorder, recurrent, mild severity; learning disorder not otherwise specified; amphetamine abuse, by history, in remission; cocaine abuse, by history; dependent personality disorder; obesity; knee, neck, and low back dysfunction; high cholesterol; hypertension; and psychological stressors consisting of a history of homelessness, losing custody of children, unemployment, and limited education. (AR 896-97.) Dr. Cushman assessed Plaintiff was a GAF score of 55.[4] (AR 897.) Dr. Cushman opined that Plaintiff "does not appear capable of performing any detailed or complex tasks in a vocational setting" but "does appear capable of performing simple and repetitive tasks." (AR 897.) Plaintiff would, however, "have difficulties with regular attendance and consistent participation in a work setting" due to "complaints of pain, fatigue, and malaise." (AR 897.) Dr. Cushman further stated that "[s]pecial or additional supervision may be needed in helping her with reading and writing and possibly monitoring for substance abuse." (AR 897.) Plaintiff "appear[ed] capable of following simple verbal instructions from supervisors, but [would] have difficulties with more complex instructions." (AR 897; *see also* Dr. Cushman's Medical Source Statement of Ability to Do Work-Related Activities (Mental), AR 898-900.)

---

[4] A GAF between 51 and 60 indicates some moderate symptoms or moderate difficulty in social, occupational, or school functioning. *DSM-IV* 34.

1    Plaintiff was seen at the emergency department of Doctors Medical Center on April 16, 2008,

2    because she was "stressed out" and "made statements to [her] family that she would cut her wrists."

3    (AR 907.)

4    On July 15, 2008, Dr. Forno opined that Plaintiff was permanently disabled and was unable

5    to work either full- or part-time.  (AR 904.)

6    **B.    Administrative Reports**

7    **1.    Plaintiff's Reports**

8    On May 4, 2005, Plaintiff completed a pain questionnaire.  (AR 505-07.)  Plaintiff indicated

9    that her pain began eight years prior; it was a "sharp constant pain" that was "always in both knees"

10   and sometimes felt like she was being stabbed with a knife.  (AR 505.)  The pain would also spread

11   to her ankles.  (AR 505.)  Plaintiff stated that "sitting, standing, [and] lying down" would bring on

12   the pain.  (AR 505.)  Plaintiff indicated that she would take medication three times a day, but that

13   it did not relieve her pain.  (AR 505.)  Plaintiff stated that "most of [her] walks are short" and that

14   she does not drive or go out.  (AR 506.)  Her household chores were minimal, and she would use a

15   motorized scooter when she went shopping.  (AR 506.)  Plaintiff indicated that her social life is non-

16   existent.  (AR 506.)  She noted that she needed assistance to shop and perform household chores,

17   she could only walk for 50 to 60 feet outside her home, and she was able to stand for 10 to 15

18   minutes at most and could only sit for 30 to 45 minutes at a time.  (AR 507.)

19   On December 29, 2005, Plaintiff completed an adult function report.  (AR 533-40.)  Plaintiff

20   stated that she could no longer go on hikes or stand for long periods of time and was unable to "enjoy

21   things like healthy people do."  (AR 534.)  She indicated that, when lying down, she could not leave

22   her legs bent or straight for long periods of time.  (AR 534.)  She needed assistance to put on pants,

23   socks, or shoes, and needed to sit on a chair while showering.  (AR 534.)  Plaintiff was able to

24   prepare a bowl of soup or a sandwich, but cooking was difficult because "standing is really hard."

25   (AR 535.)  Plaintiff indicated that she could separate colors for laundry, but it would take her one

26   hour per load and she needed assistance to carry the laundry.  (AR 535.)  Plaintiff did not go outside

27   often because it hurt when she walked.  (AR 536.)  Plaintiff would go shopping three times a month,

28   but used a motorized cart.  (AR 536.)  Plaintiff indicated that her hobbies and interests were

swimming, sewing, and drawing, but that she was unable to sew because of carpal tunnel. (AR 537.) She stated that she did not engage in any social activities and that she did not go anywhere except to the store. (AR 537.) Her knees and legs hurt too much to allow her to go out; she was unable to always finish what she started because she would need to sit down and rest her legs or hands. (AR 538.) Plaintiff stated that she used a cane and braces all the time. (AR 539.)

### 2.     Third Party Report

On December 27, 2005, Plaintiff's daughter Chadona J. Agbogidi completed a third party adult function report. (AR 525-32.) Ms. Agbogidi indicated that Plaintiff would "[b]asically sit[] around the house . . . due to [a] hard time standing on her legs. [Plaintiff] trie[d] to manage to get at least some chores done around the house" although Plaintiff's husband would cook, clean, and maintain the household. (AR 525-26.) Plaintiff used to be able to engage activities such as hiking, swimming, and jogging. (AR 526.) Plaintiff had "no problem" getting dressed, but standing in the shower would hurt her knees and her hands would go numb when doing her hair. (AR 526.) Plaintiff was able to prepare "complete meals" on a daily basis, but was unable to stand long while preparing the meals. (AR 527.) Ms. Agbogidi indicated that Plaintiff would perform laundry and cleaning, but could not work outside and she needed help with cooking, laundry, and cleaning because she "can't lift heavy equipment." (AR 527.) Plaintiff would go outside "as much as possible," and was able to shop for food, personal items, and clothing. (AR 528.) Plaintiff's interests consisted of sewing, reading, watching television, doing needlepoint, and swimming, but she was unable to do these tasks very well due to numbness in her hands. (AR 529.) Ms. Agbogidi indicated that Plaintiff engaged in social activities and that she would talk, visit, and play cards or board games. (AR 529.) She would also go to the church, doctors, and the library. (AR 529.) Ms. Agbogidi stated that Plaintiff did not go out "as much as she would like." (AR 530.) Ms. Agbogidi reported that Plaintiff "[t]akes medication on daily basis due to the pain she is feeling." (AR 532.)

### C.     Administrative Proceedings

### 1.     First Administrative Hearing and Decision

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and on

November 30, 2006, ALJ Laura Havens held a hearing in which Plaintiff, represented by counsel, vocational expert ("VE") Stephen Schmidt, and Plaintiff's witness Vicky Foster testified. (AR 86-96, 1090-1116.). The ALJ rendered a decision on February 14, 2007, finding Plaintiff not disabled. (AR 51-64.)

### a.    November 30, 2006, Hearing

### i.    Plaintiff's Testimony

The ALJ noted that Plaintiff had previously applied for SSI and that this current application had a protective filing date of April 18, 2005. (AR 1093.) Plaintiff testified that, after the protective filing date, she had worked for one month in October 2006 on a part-time basis doing in-home care, but was unable to do the work because of her "health issue." (AR 1094, 1096.) Plaintiff had also previously worked doing in-home health care work for one month in September 2002, and had worked as an elementary school-yard attendant from 1995 to 1996. (AR 1095.)

Plaintiff was living in a Christian group home for women, where she shared a room. (AR 1096.) Plaintiff was able to dress and bathe herself without help, and did the "best [she] can" performing household chores. (AR 1096.) Plaintiff would cook; wash dishes, although it would "take[] . . . time"; mop and vacuum; do her own laundry; grocery shop with help and an "electric cart"; and do a "little bit" of yard work consisting of picking up trash and leaves. (AR 1096-97, 1106.) Plaintiff, however, had a "hard time" doing the chores and would "have to take time away from standing a lot" and sometimes sit. (AR 1103.) She would also get "very tired" from standing and moving around. (AR 1103.) Plaintiff indicated that she enjoyed crocheting, reading, and swimming, but was unable to do much of these activities. (AR 1097.) She would "sometimes" watch television, but "[n]ot very often." (AR 1097.) Plaintiff took swimming and exercise classes "at the college" "for disability"; each class was held two times per week for an hour at a time. (AR 1097-98.) Plaintiff testified that she would do things outside of the home, including going to church and visiting her daughter and granddaughter. (AR 1098.)

Plaintiff stated that she would see the doctor once a month. (AR 1100.) She said that she could walk about 15 minutes before having to stop and that her lower back would get sore when she was sitting. (AR 1100.) She was able to sit at the hearing because she was "dealing with the pain,"

14

but she would usually "have to get up and move around a lot of the time." (AR 1100.) Plaintiff stated that she was unable to lift a five gallon water jug. (AR 1100.) Plaintiff said that she felt pain in her knees, ankles, and lower back, and that her hands would "get stiff" and her right hand would go "completely numb" if she held a book or larger object for too long. (AR 1100.) Plaintiff added that her hands would go completely numb on a daily basis and feel like they were on "fire." (AR 1102-03.) Plaintiff stated that without medication the pain she felt was "higher than a ten" on a scale of one to ten, with ten being the worst level of pain. (AR 1101.) With medication, Plaintiff ranked her pain at a six. (AR 1101.) Plaintiff testified that her doctor told her she needed surgery for carpal tunnel syndrome, but that it had not been performed because of a lack of insurance. (AR 1102.) She also stated that she needed knee replacements but that "they will not do it" at her age and weight because she "would have to have it done every five years." (AR 1104.)

Plaintiff testified that she used to have a drug problem and used "crystal meth [j]ust to hide the pain because [her] medications weren't helping." (AR 1107.) Plaintiff stated that she last used methamphetamine one year prior at Christmas 2005 and had not used any since then, stating that she had "no desire to." (AR 1107.)

### ii.     Witness Testimony

Plaintiff's witness Ms. Foster testified that she ran the Christian women's home where Plaintiff was living. (AR 1107-08.) Ms. Foster had been "familiar" with Plaintiff through "Bible study and stuff" since "mid-summer, late-summer, and then [Plaintiff] moved into [Ms. Foster's] facility in the middle of September [2006]." (AR 1108.) Ms. Foster stated that she saw Plaintiff every day, and that Plaintiff "has a lot of pain getting around . . . . [H]er feet hurt her. Her knees hurt, her back hurts, her hands go numb and hurt." (AR 1109.) Ms. Foster testified that she tried to have Plaintiff perform different chores, but that "she can't even complete doing dishes without having to sit down." (AR 1109.) Ms. Foster said that other people would have to complete Plaintiff's chores, and Plaintiff was unable to sweep or mop because "it hurts her." (AR 1109.) Ms. Foster stated that she knew Plaintiff's pain was "genuine because she's not running around doing other things." (AR 1109.) Ms. Foster said that Plaintiff was unable to sit through Bible study at times because she felt her hands were "on fire." (AR 1110.) Ms. Foster stated that she could see

Plaintiff's pain on a daily basis and "see her suffer." (AR 1110.)  Ms. Foster had helped Plaintiff

get the job doing in-home care during October 2006, but could see that the work left her "totally

drained" and "sore," and that she was unable to perform the work. (AR 1111.)

### iii.    VE Testimony

The VE testified that Plaintiff's prior work doing in-home care was medium and semi-skilled,

and the yard duty work was light and unskilled. (AR 1113.)  The ALJ asked the VE whether a

hypothetical person could perform Plaintiff's past relevant work if that person was of Plaintiff's age,

education, language, and work background; could sit six hours and walk two hours out of an

eight-hour day; could occasionally climb stairs but never climb ladders; could occasionally balance

and stoop but never kneel; must avoid concentrated exposure to dust; and could carry 20 pounds

occasionally and 10 pounds frequently. (AR 1113.)  The VE testified that such a hypothetical person

could not perform Plaintiff's past relevant work, but could perform other work, including

occupations such as assembler and information clerk, which were sedentary, and a sewing operator,

which was light. (AR 1113-14.)

Plaintiff's counsel questioned the VE and added the restriction to the ALJ's hypothetical that

the person must elevate her feet for one hour in an eight-hour day. (AR 1114.)  The VE testified that

such a requirement would "eliminate" the positions identified. (AR 1114-15.)

### b.    February 14, 2007, ALJ Decision

On February 14, 2007, the ALJ issued a decision finding Plaintiff not disabled since April

18, 2005, the date her current SSI application had been filed. (AR 51-63.)  Specifically, the ALJ

found that (1) Plaintiff had not engaged in substantial gainful activity since September 16, 2003, the

alleged disability onset date; (2) Plaintiff had severe impairments of obesity, osteoarthritis of the

knees, asthma, and a history of methamphetamine use based on the requirements in the Code of

Federal Regulations; (3) Plaintiff did not have an impairment or combination of impairments that

met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) Plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently, sit six

hours and stand/walk two hours each in an eight-hour day, was limited to occasionally climbing,

balancing, and stopping, was precluded from kneeling, crouching, crawling, and climbing ladders,

and must avoid continuous exposure to dust and fumes; (5) Plaintiff had no past relevant work; (6) Plaintiff was defined as a younger individual on the date application was filed; (7) Plaintiff had at least a high school education and was able to communicate in English; (8) transferability of job skills was not an issue because Plaintiff did not have past relevant work; (9) there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; (10) Plaintiff had not been under a disability as defined under the Act since April 18, 2005, the date the application was filed; and (11) Plaintiff met the criteria of a changed circumstance since new and material evidence indicated that Plaintiff's knee condition had worsened since the date of the prior decision on her earlier SSI applications, and that her carpal tunnel syndrome and depression were no longer severe. (AR 57-63.)

## 2. January 11, 2008, Appeals Council Decision

Plaintiff sought review of the ALJ's decision before the Appeals Council. (AR 49-50.) On January 11, 2008, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further review. (AR 44-48.) The Appeals Council found that "the medical record contains conflicting opinions regarding [Plaintiff's] physical and mental impairments which were not adequately addressed in the [ALJ's] decision." (AR 45.) The Appeals Council remanded the case and ordered the ALJ to:

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating and examining source opinions pursuant to the provisions of 20 CFR 416.927 and Social Security Rulings 96-2p and 96-5p and nonexamining source opinions in accordance with the provisions of 20 CFR 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the examining sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments.
>
> Evaluate the claimant's obesity pursuant to the adjudicative provisions set forth in Social Security Ruling 02-1p.
>
> Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 416.929) and Social Security Ruling 96-7p.

Evaluate the lay opinions of nurse practitioner, the lay testimony of the claimant's friend, and the written statements from the claimant's other friend and daughter, pursuant to the adjudicative provisions set forth in 20 CFR 416.913(d)(2) and (4) and Social Security Ruling 06-3p.

Depending on the limitations and/or restrictions ultimately found, determine whether further evidence from a vocational expert is needed.

(AR 47.)

### 3.    Second Administrative Hearing and Decision

Upon remand from the Appeals Council, the ALJ held another hearing on October 1, 2008,[5] and rendered a second decision on April 8, 2009, also finding against Plaintiff.  (AR 15-29, 1117-49.)

### a.    October 1, 2008, Hearing

On October 1, 2008, the ALJ held a hearing in which Plaintiff, represented by counsel, VE Schmidt, and medical expert Michael Stuart Gurvey, M.D., testified.  (AR 1119-49.)

### i.    Plaintiff's Testimony

Plaintiff testified that she had only worked for one month, October 2006, doing in-home care since her protective filing date of April 18, 2005.  (AR 1121-22.)  Plaintiff stated that she was currently living in a house with her husband and that she was able to dress herself and do chores around the home, including cooking, washing dishes, mopping, sweeping, laundry, and grocery shopping.  (AR 1122-23.)  Plaintiff said that she would "crochet sometimes" for up to a "couple of hours."  (AR 1123-24.)  Plaintiff also stated that she would "just sit and read," and the amount of time she read "all depends on the book" but averaged two to three hours  (AR 1123.)  Plaintiff stated that she watched television and could "sit there all day" doing so.  (AR 1123.)  Plaintiff did not exercise "as much as [she] should," but would walk about five to ten minutes when she did exercise. (AR 1124.)

---

[5] The transcript of the second ALJ hearing contains a typographical error and states that the hearing took place on November 30, 2006, the date of the first ALJ hearing.  (*See* AR 1090, 1092, 1117, 1119, 1149.)  The second ALJ hearing could not have been held at the date and time as the first ALJ hearing; further, the second ALJ hearing transcript refers to a time period in 2007 and thus could not have been held in 2006.  (*See* AR 1122.)  It appears that the second ALJ hearing was actually held on October 1, 2008.  (*See* Doc. 26, 4:14 (Commissioner's opposition briefing referencing the 2008 hearing date).)

18

Plaintiff testified that she used methamphetamine at one time and that, although the records indicated that she quit in 2005, she used it "[o]ff and on" since then. (AR 1124.)  The last time she used methamphetamine was one month prior to the hearing, and she would use it "[m]aybe two or three times" a year. (AR 1124.)  Plaintiff did not have a driver's license because she did not get it renewed, and she would "sometimes" use public transportation. (AR 1125.)

Plaintiff stated that Dr. Forno was her primary doctor and that she was not seeing anyone for mental health at the time of the hearing. (AR 1125.)  She was on various medications and would see the doctor once a month. (AR 1126.)  Plaintiff stated that she could walk or stand "[f]ive to ten minutes, at the most," and could "sit at least two to three hours, but still in pain." (AR 1126.)  Plaintiff stated that, on a scale from one to ten with ten being the worst level, her pain averaged a ten without medication, and although medication helps she had not been on medication for the pain. (AR 1127.)  Plaintiff indicated that her hands would "go to sleep" if she constantly sewed or read. (AR 1127.)  She would crochet for a couple of hours, but then would "stop and let [her] hands wake up or [her] fingers [would] become numb." (AR 1127-28.)  Plaintiff clarified that she would crochet for "[a]bout 15 minutes" before having to stop and rest her hands, would take a 10 to 15 minute break to allow her hands to "stop tingling and stop being so numb," and then could crochet for "maybe half an hour to an hour." (AR 1128-29.)  Plaintiff said that her problems related to depression were "[j]ust sleeping and staying away from everybody." (AR 1128.)  Plaintiff testified that she would have pain in her lower back if she sat too long and that an x-ray of her right shoulder showed "arthritis built up in it." (AR 1130.)

Plaintiff said that she had problems reaching up and that she was "not sure if [she] could" work an assembly job reaching forward all day "[b]ecause it would start bothering" her. (AR 1130.)  She had problems doing chores at home because she would have to sit to do everything because she "can't stand for periods of time" due to pain in her lower back and knees  (AR 1131.)  Plaintiff indicated that her hands would "go to sleep at times in the middle" of doing dishes. (AR 1132.)  Plaintiff said that she would have to go to the restroom every half hour to hour due to taking water pills. (AR 1132-32.)

### ii.     Testimony of Dr. Gurvey

Dr. Gurvey testified that he had reviewed the medical records in the file at the time of the hearing and determined that Plaintiff suffered from five areas of medical problems, four of which were orthopedically or neuromuscularly related: history of left knee pain with degenerative osteoarthritis, status pro arthroscopy of the right knee, possible history of carpal tunnel, history of low back pain that was identified more by Plaintiff's testimony at the hearing than in the records, and the "most important" general medical problem of morbid obesity. (AR 1133-34.) Plaintiff also had a history of hypertension, asthma, and depression. (AR 1134.) Dr. Gurvey stated that the diagnosis of carpal tunnel syndrome was not supported by the medical record. (AR 1134.)

Dr. Gurvey testified that Plaintiff had work preclusion based on her medical problems and stated that Plaintiff "could safely lift and carry 20 pounds occasionally and 10 pounds frequently. She could sit six out of eight hours; she could stand and walk four out of eight hours with the ability to alternate every hour . . . primarily because of the left knee." (AR 1135.) Dr. Gurvey noted that there were no current records providing an orthopedic assessment and advised that board certified orthopedic assessment should be performed to determine the status of Plaintiff's knee. (AR 1135-36.) Dr. Gurvey stated that on a postural basis, Plaintiff "should not climb ladders, scaffolds or ropes primarily because of obesity and because of the left knee" and she "could occasionally crawl, kneel, squat, [and] stoop. Meniscually, there would be no restrictions because the diagnosis of the carpal tunnel syndrome has just not been established." (AR 1136.)

Dr. Gurvey testified that the information in the record that described Plaintiff's alleged hand limitations due to carpal tunnel was "a questionnaire," and did "not reflect a direct examination." (AR 1137.) Dr. Gurvey noted that the exhibit was dated August 2, 2006, "and it was the only exhibit that showed positive Phalen's and Tinel tests. There [are] no other records that show that. There are no electrodiagnostic procedures that are in the medical records, and [they] really did not have any good examination of her hands or wrists." (AR 1137.) Plaintiff's counsel directed Dr. Gurvey to the opinion of Dr. Aboughannam, which Dr. Gurvey had considered and noted that Dr. Aboughannam indicated manipulative limitations of handling, grasping, and fingering, but that there was no "support for the diagnosis before that kind of conclusion [was] made." (AR 1138-39.) Dr.

1   Gurvey noted that the examination indicated that the wrists had a full range of motion, sensory

2   testing was normal, and there was no mention of a Phalen's or Tinel's sign.  (AR 1139.)  Plaintiff's

3   counsel noted that there were missing records that might support Plaintiff's complaint, which Dr.

4   Gurvey acknowledged.  (AR 1139.)

5                              **iii.      VE Testimony**

6          The VE testified that Plaintiff had previously worked as a home health attendant, which was

7   medium work, and teacher's aide, which was light.  (AR 1146.)  The ALJ asked the VE whether a

8   hypothetical person could perform Plaintiff's past relevant work if that person was of Plaintiff's age,

9   education, language, and work background; could sit six hours and stand/walk four hours out of an

10  eight-hour day; required a sit/stand option to perform her job; could carry 20 pounds occasionally

11  and 10 pounds frequently; could never climb stairs or ladders and could only balance, stoop, kneel,

12  crouch, or crawl; must avoid concentrated exposure to dust, fumes and smoke; and was able to

13  understand, remember, and carry out simple instruction only.  (AR 1147.)  The VE testified that such

14  a hypothetical person could not perform Plaintiff's past relevant work, but could perform other work,

15  including occupations such as a garage attendant and sewing operator, which were light, and

16  information clerk, which was sedentary.  (AR 1113-14.)

17         Plaintiff's attorney questioned the VE and added additional limitations to the hypothetical

18  person being considered with the ability to stand/walk two hours a day, lift eight ounces frequently,

19  and further limitations to reaching, pushing, pulling, and grasping.  (AR 1148.)  The VE testified that

20  the added limitations would "eliminate the jobs."  (AR 1148.)

21                        **b.      April 8, 2009, ALJ Decision**

22         On April 8, 2009, the ALJ issued a decision finding Plaintiff not disabled since April 18,

23  2005, the date her current SSI application had been filed.  (AR 15-29.)  Specifically, the ALJ found

24  that (1) Plaintiff had not engaged in substantial gainful activity since April 18, 2005, the application

25  date; (2) Plaintiff had severe impairments of obesity, osteoarthritis of the knees, asthma, and a

26  history of methamphetamine use based on the requirements in the Code of Federal Regulations;

27  (3) Plaintiff did not have an impairment or combination of impairments that met or equaled one of

28  the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff had the RFC

to perform light work as defined in 20 C.F.R. § 416.767(b), except she can sit and stand for four hours each in an eight-hour day and requires the option to change position from sitting to standing and vice versa, she should not climb stairs or ladders but can balance, stoop, kneel, crouch, or crawl occasionally, and should avoid concentrated exposure to dust, fumes, smoke, and other respiratory depressants; (5) Plaintiff was unable to perform any past relevant work; (6) Plaintiff was defined as a younger individual on the date the application was filed; (7) Plaintiff had at least a high school education and was able to communicate in English; (8) transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff was not disabled whether or not she had transferable job skills; (9) there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; and (10) Plaintiff had not been under a disability as defined under the Act since April 18, 2005, the date the application was filed. (AR 21-29.)

Plaintiff sought review of this decision before the Appeals Council. On June 3, 2011, the Appeals Council denied review. (AR 7-9.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

**D.   Plaintiff's Contentions on Appeal**

On August 5, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff contends that the ALJ improperly rejected the opinions of the treating physician, failed to properly credit the opinions of the examining physicians, improperly rejected Plaintiff's testimony and allegations, improperly rejected the lay witness testimony, and failed to fully develop the mental health record. (Doc. 25.)

### III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial

evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.  **APPLICABLE LAW**

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the

requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform his past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

### A. The ALJ's Consideration of Medical Evidence

Plaintiff contends that the ALJ improperly rejected the opinions of Plaintiff's treating physician, Dr. Khanna, and failed to properly credit the opinions of certain examining physicians. (Doc. 25, 7:3-14:2, 18:20-21:19) Defendant asserts that the ALJ properly weighed the evidence concerning Plaintiff's impairments and limitations. (Doc. 19, 11:16-14:6.)

#### 1. Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and

thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

> **2.    The ALJ Failed to Provide Specific and Legitimate Reasons for Rejecting Dr. Khanna's Opinion**

Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Khanna, and contends that the opinion was properly supported by substantial evidence in the record.  (Doc. 25, 7:5-8:6.) Defendant contends that the ALJ properly rejected Dr. Khanna's opinion as being inconsistent with the medical records and rejected Dr. Khanna's two-page questionnaire as being conclusory and providing very little explanation of the evidence relied upon in forming the opinion.  Defendant asserts that the ALJ's RFC determination was properly supported.  (Doc. 26, 9:23-10:7.)

The ALJ assessed the findings of Dr. Khanna as follows:

> The undersigned gives little weight to the assessment of the claimant's physician to the effect that she is limited to sedentary work and has multiple limitations in the use of her upper extremities and is unable to cope with stress. The opinion is expressed in the form of a questionnaire and is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion.  Further, the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor reported.  With specific regard to the assessment of the claimant's alleged carpal tunnel syndrome and manipulative limitations, the undersigned notes that the treatment's records do not document the clinical signs used by the doctor in the questionnaire.  The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of the record, as in the current case.

(AR 27.)

Accordingly, the ALJ rejected Dr. Khanna's opinion because it was (1) conclusory with little explanation, (2) inconsistent with the extent of treatment that Plaintiff received, (3) discussed limitations due to carpal tunnel syndrome that were not supported by clinical finding in the record, and (4) was expressed either due to the doctor's sympathy for Plaintiff or due to Plaintiff's insistence.

1    The Ninth Circuit has "held that 'clear and convincing' reasons are required to reject the

2  treating doctor's ultimate conclusions." *Lester*, 81 F. 3d at 830 (*citing Embrey v. Bowen*, 849 F.2d

3  418, 422 (9th Cir.1988)).  Further, if the treating doctor's opinion is contradicted by another doctor,

4  the ALJ "may not reject this opinion without providing 'specific and legitimate reasons' supported

5  by substantial evidence in the record." *Id*.  As such, to reject a treating physician's opinion, the ALJ

6  must provide an interpretation of the facts and conflicting clinical evidence, and make a finding

7  based on that interpretation.  *See Tommasetti*, 533 F.3d at 1041.  It is improper for the ALJ to set

8  forth conclusions determining that a doctor's findings are rejected without providing an

9  interpretation of the facts. "The ALJ must do more than offer [her] conclusions. [She] must set forth

10  [her] own interpretations and explain why they, rather than the doctors', are correct." *Embrey*,  849

11  F.2d at 421-22.

12    Here, the ALJ correctly notes that Dr. Khanna's opinion provides little evidence and is

13  conclusory, as Dr. Khanna offers findings regarding Plaintiff's carpal tunnel syndrome and other

14  impairments without explaining the basis for the limitations asserted.  (AR 27, 845.)  The ALJ

15  offered conclusions for rejecting Dr. Khanna's opinion, but failed to clearly set forth an

16  interpretation of the evidence in the record which led to the ultimate determination.  The ALJ,

17  however, failed to actually discuss any of Dr. Khanna and Golden Valley's treatment records, and

18  merely offered conclusions without providing any explanation as to how they were made.  (AR 27.)

19   The ALJ cannot simply offer conclusions in the guise of findings.  *Cf. Kepler v. Chater* 68 F.3d 387,

20  391 (10th Cir. 1995).  It is the ALJ's lack of explanation, not the actual findings, that is problematic

21  here.

22    "To say that medical opinions are not supported by sufficient objective findings or are

23  contrary to the preponderant conclusions mandated by the objective findings does not achieve the

24  level of specificity our prior cases have required, even when the objective factors are listed seriatim."

25  *Embrey*, 849 F.2d at 421.  Here, the ALJ asserts that Dr. Khanna's treatment of Plaintiff "has not

26  been consistent with what one would expect if the claimant were truly disabled," but fails to explain

27  how the treatment was lacking or what additional treatment should have occurred.  (*See* AR 27.)

28

Further, the ALJ's decision states that "[w]ith specific regard to the assessment of the claimant's alleged carpal tunnel syndrome and manipulative limitations, the undersigned notes that the treatment's records do not document the clinical signs used by the doctor in the questionnaire." (AR 27.) The ALJ relies on Dr. Gurvey's testimony at the hearing that "the only mention of positive Tinel's or Phalen's sign is in a questionnaire completed by the claimant's physician that is unsupported by any objective clinical findings." (AR 26.) However, Plaintiff's counsel at the hearing indicated that additional records from Dr. Khanna and Golden Valley had yet to be submitted and, as such, Dr. Gurvey was unable to review all the medical records before rendering his opinion. (*See* AR 1120, 1140; *see also* Doc. 25, 21:11 (Plaintiff's opening briefing noting that Dr. Gurvey "did not have [] about 200 pages of evidence to review").) The Court notes that medical records from Golden Valley show that on August 19, 2005, Dr. Locum of Golden Valley diagnosed Plaintiff with carpal tunnel and noted that testing showed that she was positive for tingle on tapping, and on August 1, 2006, Dr. Khanna reported positive Phalen's and Tinel's signs. (AR 1048, 1057, 1061.) Thus, Dr. Gurvey's assertion that there were no objective clinical findings related to carpal tunnel syndrome is not supported, since it is contradicted by medical records that Dr. Gurvey did not consider. As such, since the ALJ's findings were based heavily on Dr. Gurvey's testimony and findings, the ALJ's decision also lacks support.

Lastly, the ALJ postulates that Dr. Khanna may have expressed his opinion in an effort to assist a patient with whom he "sympathizes," or that Plaintiff may have been "quite insistent and demanding in seeking supporting notes or reports" from her physician. (AR 27.) However, the ALJ "may not assume that doctors routinely lie in order to help their patients collect disability benefits." *Lester*, 81 F.3d at 832 (citation omitted). To support such a finding, the ALJ should "introduce evidence of actual improprieties." *Id*. (citation omitted). Here, the ALJ offered no such evidence and noted that "it is difficult to confirm the presence of such motives." (AR 27.)

Accordingly, the ALJ failed to provide specific and legitimate reasons for rejecting the opinion of Plaintiff's treating physician, Dr. Khanna because the ALJ failed to discuss the reasoning for the conclusions that were reached.

**3.     The ALJ Failed to Properly Weigh the Opinions of the Examining and Consulting Physicians**

Plaintiff contends that the ALJ failed to properly credit the opinion of certain consulting physicians, including Drs. Aboughannam and Forno. (Doc. 25, 18:20-21:19.) The ALJ's decision does not address the opinion of Dr. Aboughannam, who opined that, based on Plaintiff's bilateral knee pain, she would be limited to standing and/or walking two hours in an eight-hour day, but would have no limitation as to sitting. (AR 606-10.) Nor does the ALJ address Dr. Forno's opinion that Plaintiff was permanently disabled. (AR 904.) Plaintiff contends that Drs. Aboughannam and Forno's opinions affirm Dr. Khanna's conclusions regarding impairments. (Doc. 25, 13:22-24, 18:21-25.)

In opposition, Defendant asserts that Dr. Aboughannam's opinion was issued in 2004 and was not relevant to the time period in question, and that the later opinions from consulting physicians, Drs. McIntire and Dhiman, and the testimony of reviewing physician Dr. Gurvey at the October 1, 2008, hearing support the ALJ's RFC. Defendant also asserts that Dr. Forno's findings have "no special significant in this case." (Doc. 26, 7:13-11:7.) Defendant contends that the ALJ supported the determination of Plaintiff's RFC with substantial evidence from Drs. McIntire, Dhiman, and Gurvey.

The ALJ's decision "gives substantial weight to the assessments of the State Agency medical consultants and the testimony of the impartial expert to the effect that the claimant can perform light work with postural and environmental limitations." (AR 27.) The ALJ found that "[t]hese assessments are wholly consistent with the weight of the evidence of the record and rendered by physicians who are experts in the evaluation of the medical issues in disability claims under the Social Security Act." (AR 27.) The ALJ, however, does not identify which medical consultants are being given weight (presumably Drs. McIntire, Dhiman, and Gurvey, based upon Defendant's opposition), nor does the ALJ identify any consultants or physicians whose opinions are not given weight (presumably Drs. Aboughannam and Forno, based upon Plaintiff's assertions). As such, the Court cannot accurately determine what opinions were weighed by the ALJ.

Further, stating that a physician's opinion is consistent or inconsistent with the record is an insufficient reason for accepting or rejecting it. Mere inconsistency between doctors' opinions does not allow the ALJ to simply select one opinion based solely on the fact that an inconsistency exists. It is the ALJ's responsibility to address the conflict and explain how the conflict is resolved by assigning weight to differing opinions based on cogent, specific, and legitimate reasons. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999); *Reddick v. Chater*, 157 F.3d 715, 722, 725 (9th Cir. 1998). Merely pointing out that a conflict of opinion exists is not a legitimate ground, in and of itself, to assign weight to credit or discredit one of the opinions. The ALJ must explain why that weight was assigned. With the exception of the testimony of Dr. Gurvey, whose opinions was not based on the entire medical record, the ALJ fails explain the reasoning for accepting or rejecting any of the doctors' opinions. (*See* AR 26-27.) Although Plaintiff's opposition offers reasons, the ALJ's decision does not.

The opposition brief provides a substantial discussion of how the opinions of Dr. McIntire and Dr. Dhiman support the ALJ's RFC determination and why Dr. Khanna's opinion was not persuasive. (Doc. 26, 7:13-11:7.) These reasons, however, were not articulated in the ALJ's decision. While the Court can draw reasonable inferences that exist from the ALJ's opinion, *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989), the Court cannot consider Defendant's post hoc rationalizations. The Ninth Circuit has repeatedly emphasized that the "bedrock principle of administrative law" is that a "reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." *Ceguerra v. Sec'y of Health & Human Servs.*, 933 F.2d 735, 738 (9th Cir. 1991); *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (noting that a reviewing court is "constrained to review the reasons the ALJ asserts."). An agency's decision cannot be affirmed on the ground that the agency did not invoke in making its decision. *Pinto v. Massanari,* 249 F.3d 840, 847-48 (9th Cir. 2001).

The ALJ does, however, provide extensive reasons for relying upon the opinion offered by Dr. Gurvey while testifying at the second administrative hearing. (AR 26.) As noted above, Dr. Gurvey did not consider the entirety of Plaintiff's medical records, as numerous records from Dr. Khanna and Golden Valley were submitted after the hearing. (*See* AR 1120; *see also* Doc. 25, 21:11

(Plaintiff's opening briefing noting that Dr. Gurvey "did not have [] about 200 pages of evidence to review").)  As such, the only physician's opinion that the ALJ articulates reasons for accepting – Dr. Gurvey's opinion – was based upon an incomplete record.  It is thus unclear whether a review of Plaintiff's full records would have altered Dr. Gurvey's findings in any way and thus potentially altered the ALJ's findings.

As this case is being remanded for reconsideration of the medical evidence of Dr. Khanna, the ALJ should also address the opinions of the examining and consulting physicians upon remand and explain the reasons for crediting and not crediting those opinions.

### 4.    Remand is Appropriate to Address the Deficiencies in the ALJ's Consideration of Medical Evidence

Remand is appropriate when, like here, a decision does not adequately explain how a conclusion was reached, "[a]nd that is so even if [the Commissioner] can offer proper post hoc explanations for such unexplained conclusions," for "the Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Barbato v. Comm'r of Soc. Sec.*, 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996) (citations omitted).

The Court hastens to note, however, that it is not suggesting that the ALJ's ultimate conclusions were necessarily incorrect – only that the decision was conclusory and failed to provide reasons for rejecting, or even accepting, certain opinions.  It is the province of the ALJ, not the Court, to assess the medical evidence.  The Court cannot affirm the ALJ's conclusions on grounds that were not invoked by the agency.  *Ceguerra*, 933 F.2d at 738.

## B.    The ALJ's Determination of Plaintiff's Credibility

Plaintiff contends that the ALJ improperly rejected her testimony concerning her impairments and failed to identify specific evidence showing that specific testimony was not credible.  (Doc. 25, 14:4-17:10.)  According to the Commissioner, however, the ALJ found that the record contained substantial evidence to support a conclusion that Plaintiff is exaggerating her limitations.  (Doc. 26, 12:26-14:24)  In considering Plaintiff's credibility, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these

symptoms are not credible to the extent that they are inconsistent with the [ALJ's] residual functional capacity assessment."  (AR 26.)

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  (AR 26.)  Therefore, absent affirmative evidence of malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing. *Vasquez*, 572 F.3d at 591.

While the ALJ provided numerous reasons for finding that Plaintiff was "not credible" to the extent that her described symptoms were "inconsistent" with the RFC determination, these reasons included that Plaintiff "complained sporadically about carpal tunnel syndrome but there is very little, if any, objective clinical evidence in the record to support this diagnosis.  As the impartial medical expert pointed out at the hearing, the only indication of positive Tinel's and Phalen's sign is in a

questionnaire completed by the claimant's physician." (AR 26.) As noted above, however, this finding is not accurate since the medical records indicate positive Tinel and Phalen findings, and Dr. Gurvey had not considered these records prior to testifying at the hearing. (*See* AR 1048, 1057, 1120.)

Further, the ALJ noted that "[t]here is no question that the claimant is morbidly obese. She also admitted at the hearing that she continues to use methamphetamine. Her obesity and drug abuse are the more likely cause of her complaints of multiple aches and pains." (AR 27.) While the ALJ can discredit Plaintiff's testimony based on drug use and such an impairment cannot be considered disabling, *see* 42 U.S.C. § 423(d)(2)(C), the ALJ had determined that Plaintiff's obesity was a severe medical impairment. (AR 21.) Accordingly, the ALJ's finding that Plaintiff's impairments were based, at least in part, on her obesity is not necessarily a reason to find Plaintiff not credible. The ALJ should assess the effect that obesity had on Plaintiff's ability to perform routine movement and necessary physical activity within the work environment. *See* Social Security Ruling 00-3p.[6] The ALJ fails to explain why Plaintiff is less than credible because her impairments were likely caused by obesity as opposed to other conditions.

Because the Court remands this case for renewed consideration of the medical evidence, the Court dispenses with an exhaustive analysis of the ALJ's assessment of Plaintiff's credibility. Consideration of Plaintiff's credibility is inescapably linked to conclusions regarding the medical evidence. 20 C.F.R. § 416.929. Moreover, as discussed above, there are elements of the ALJ's credibility determination that should be given renewed consideration. The ALJ found Plaintiff's statements less probative in light of the medical evidence of record; thus, Plaintiff's testimony may be reconsidered by the ALJ if warranted after renewed consideration of the medical opinions.

## C.   The ALJ's Consideration of Third Party Witnesses

Plaintiff contends that the ALJ failed to properly consider third-party witnesses despite having been ordered to do so by the Appeals Council, by either failing to rule on the weight given

---

[6] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding precedent upon ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

to the evidence actually considered or failing to recite any evidence by other witnesses. (Doc. 25, 17:12-18:18.) Defendant asserts that the ALJ did discuss the third-party witness statement by Plaintiff's daughter and that "[t]aken as a whole, Ms. Agbogidi's testimony can reasonably be read to support the ALJ's decision which limits Plaintiff to simple light work with a sit stand option." (Doc. 26, 14:27-15:3.)

Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). The Ninth Circuit has held that competent lay witness testimony cannot be disregarded without comment, *id*, and that to discount it, the ALJ "must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

Here, the ALJ noted that Ms. Agbogidi, Plaintiff's daughter, submitted a witness statement that identified the activities that Plaintiff was able to perform. (AR 25.) The ALJ, however, neither explained how this statement was considered, nor provided any reason for either rejecting or accepting Ms. Agbogidi's statement. Although Defendant asserts that Ms. Agbogidi testimony can "reasonably" be considered as supporting the ALJ's decision, the ALJ does not indicate in the decision that she accepted the statement or show how it supported her findings. In sun, the ALJ failed to provide any explanation as to how she considered Ms. Agbogidi's statement.

The Court further notes that the Appeals Council's remand decision ordered the ALJ to "[e]valuate the lay opinions of a nurse practitioner, the lay testimony of the claimant's friend, and the written statements from claimant's other friend and daughter . . ." (AR 47.) The ALJ failed to discuss any lay witness testimony other than the statement from Plaintiff's daughter. (*See* AR 18-29.)

Because the Court remands this case for renewed consideration of the medical evidence, the Court dispenses with an exhaustive analysis of the third-party statements. Consideration of lay testimony is inescapably linked to conclusions regarding the medical evidence. 20 C.F.R. § 416.929. As such, the ALJ should consider the third-party statements in light of the reconsideration of the medical evidence.

**D.      The ALJ's Duty to Develop the Mental Health Record**

Plaintiff contends that the ALJ failed to fully develop Plaintiff's mental health record and failed to consider lay witness testimony regarding Plaintiff's mental health conditions.  (Doc. 25, 21:21-22:14.)  Defendant contends that the ALJ properly assessed Plaintiff's alleged mental limitations.  (Doc. 26, 11:8-12:25.)

The ALJ has a special duty to fully and fairly develop the record and to insure that the claimant's interests are considered.  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).  "The ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous."  *Id.* (citation omitted).

Here, the ALJ provided an analysis of several psychiatric evaluations and concluded that Plaintiff's "medically determinable mental impairment of depression does not cause more than minimal limitations in the claimant's ability to perform basic mental activities and is therefore nonsevere."  (AR 22-24.)  Plaintiff has not shown how the mental health evidence was either inadequate or ambiguous to the extent that the ALJ was required to more fully develop the record.

The Court notes, however, that the ALJ did not address the evidence from Golden Valley, which includes a discussion of Plaintiff's mental impairments.  (*See* AR 669.)  As this case is being remanded for renewed consideration of medical evidence, the ALJ should address any issues regarding Plaintiff's mental health evidence and either more fully develop the record if needed or explain why such a development is not necessary.

**E.      Remand is Warranted**

As a general rule, remand is warranted where additional administrative proceedings could remedy the defects in the Commissioner's decision.  *See Harmon v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000).  In this case, remand is appropriate for renewed consideration of medical and other opinions.  The ALJ is instructed to take whatever further action is deemed appropriate consistent with this decision.

## VI.  CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence.   Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be REVERSED and the case REMANDED to the ALJ to make additional findings consistent with this order.

This Findings and Recommendation will be submitted to the district judge pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with this Findings and Recommendation, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.1991).


IT IS SO ORDERED.

**Dated:     January 28, 2013**                      /s/ Sheila K. Oberto
                                                     UNITED STATES MAGISTRATE JUDGE